IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA,         )<br>                                                            )<br>                   Plaintiff,                 )         **CRIM. NO.: 10-cr-0038**<br>       v.                                             )<br>                                                            )<br>JEROME TURNBULL                      )<br>                                                            )<br>                   Defendant.             )<br>_____)| |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Finch, Senior Judge

THIS MATTER is before the Court on Defendant Jerome Turnbull's ("Defendant") Motion to Suppress. During a traffic stop of Defendant, police found a 9 mm semi-automatic pistol under the driver's seat rug. Defendant was subsequently charged with felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and unauthorized possession of a firearm in violation of 14 V.I.C. § 2253(a). Defendant now seeks to suppress that firearm on the basis that it is the fruit of an unreasonable search. The Government opposes Defendant's Motion. A hearing on Defendant's Motion to Suppress was held on February 8, 2011. For the reasons stated below, the Court denies Defendant's motion.

I.   **Findings of Fact**[1]

On the night of May 1, 2010, Deputy Chief Howell of the Virgin Islands Police Department ("VIPD") was patrolling in the Estate Grove Place area during a "saturated patrol." D/C Howell observed a white Ford Explorer run a stop sign and then make an unsignaled turn. D/C Howell engaged his vehicle's blue emergency lights and effectuated a traffic stop of the Explorer. He radioed 911 dispatch to inform them of the traffic stop. While still seated in his police vehicle, D/C Howell observed the Explorer's driver, later identified as the Defendant, Jerome Turnbull, leaning over and reaching toward the floor.

D/C Howell exited the Tahoe and approached the driver's door of the Explorer. He observed Defendant, seated in the driver's seat, breathing extremely heavily. D/C Howell explained to Defendant why he had been stopped and asked Defendant for his license and registration. Defendant complied. After looking at Defendant's license, D/C Howell asked Defendant if he was related to Elton Turnbull to which Defendant replied in the affirmative. D/C Howell then explained that he was one of the investigating officers in Elton Turnbull's drug trafficking case and that he was partly responsible for putting Elton Turnbull in jail. Defendant then denied any relation to Elton Turnbull. At some point during this conversation, D/C Howell returned Defendant's documents. Defendant, however, continued to breathe heavily.

D/C Howell then asked Defendant if he had any guns, drugs, or anything else that he was not supposed to have in the vehicle.[2] Defendant, who was looking straight at Howell, did not

---

[1] These findings are based on the testimony of Deputy Chief Howell and Officer Jose Ramos of the Virgin Islands Police Department given at the suppression hearing. At the hearing, Defendant called two witnesses, both employees at Virgin Islands 911 emergency dispatch. However, because their testimony is irrelevant to the disposition of this motion, the Court does not include it in its recitation of the facts.

respond. D/C Howell repeated the question and Defendant responded by stating that he had just left his house to get diapers for his child. Confused, Howell asked Defendant if this meant that he had left his child home alone and Defendant responded that he was with his mother.

At about the same time that D/C Howell was questioning Defendant, Chief Benta of the VIPD arrived at the scene. Howell informed Defendant that he was going to speak with Chief Benta and then left Defendant's car to speak with Benta. With his back turned to Defendant, D/C Howell informed Chief Benta that Defendant seemed extremely nervous, refused to answer questions, and that "something was not right." Benta then alerted Howell that Defendant "was reaching toward the floor." D/C Howell approached the Explorer's passenger side and told Defendant to keep his hands on the steering wheel where they could be seen.

D/C Howell then returned to his police vehicle and called 911 dispatch to request for a K-9 unit. He testified that he requested a K-9 unit because he suspected that Defendant might have drugs in the vehicle and that he wanted additional backup because Defendant's actions had made him nervous. The K-9 unit was in the vicinity and arrived two or three minutes after being called.

Officers Jason Riveros and Jose Ramos of the VIPD K-9 unit approached the driver's door of the Explorer while Howell approached the passenger side. Officer Ramos and D/C Howell each witnessed Defendant reach down toward the floor of the vehicle. Officer Ramos instructed Defendant to show his hands. Defendant briefly complied and then again reached towards the floor. After several more ignored commands to show his hands, Officer Ramos

---

[2] D/C Howell testified that this was a "standard question" that the VIPD asks at traffic stops.

drew his gun and held it at the "low ready" position.[3]  Officer Ramos then ordered Defendant out of the vehicle. Defendant ignored this command.  After repeating it several times, Defendant opened the door and Chief Benta, who was also near the Explorer, noticed a knife in the driver's side front seat armrest and yelled "Knife!"  Defendant shut the door, put the car in gear and released the handbrake.   D/C Howell reached into the car from the passenger side and removed the keys from the ignition.  Howell then ordered Ramos and Riveros to remove Defendant from the car.[4]

Officer Ramos again ordered Defendant out of the car.  Defendant exited the vehicle and Ramos escorted him to the rear bumper and advised Defendant that he was being arrested for obstructing an officer in the discharge of his duties.  Officer Ramos instructed Defendant to sit on the rear bumper.  Defendant looked around and refused to sit down.  At that point, Officer Ramos was concerned that Defendant might attempt to flee.  Officer Riveros remotely released his canine partner, who came and heeled at his side.  Officer Ramos then informed Defendant that if he attempted to run, they would "deploy" the dog.

While Defendant was detained by Officers Ramos and Riveros at the rear of Explorer, D/C Howell looked at floor area where Defendant had repeatedly been reaching and noticed what he described as a "bulge" in the carpet.  He lifted the bulge and found the firearm that is the subject of Defendant's suppression motion.  D/C Howell yelled "Gun!"  Officer Riveros and Ramos then brought Defendant to the ground and cuffed him.

---

[3] Officer Ramos explained that the "low ready" position is when a gun is drawn, pointed low, and not trained on a suspect.
[4] Officer Ramos testified that he did not hear D/C Howell's request and that he ordered Defendant out of the vehicle because he refused to comply with their requests for him to keep his hands on the steering wheel.

4

## II. Analysis

Defendant does not quarrel with the initial stop of his vehicle; rather, he challenges two aspects of the ensuing events that lead to the discovery of the firearm.  First, Defendant argues that D/C Howell unlawfully prolonged the traffic stop by not issuing him a ticket or letting him go upon returning his documents.  Second, Defendant argues that D/C Howell unlawfully searched his car because, at the time of the search, he was in police custody and could not have reasonably accessed anything inside the Explorer.

### a. The Traffic Stop

Defendant's first argument is essentially that the VIPD prolonged the stop beyond its initial scope.  However, "[a]fter a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003); *see also United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) ("[O]nce a car has been legally stopped, the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants.").  The test for reasonable suspicion is "one of reasonableness given the totality of the circumstances, which can include [defendant]'s location, a history of crime in the area, [defendant]'s nervous behavior and evasiveness, and [the officer]'s 'commonsense judgments and inferences about human behavior.'" *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000)).

Here, Defendant's actions – from the beginning of the stop until his arrest – provided the VIPD with reasonable suspicion to increase the scope of the detention beyond a traffic violation

investigation. First, when Defendant was initially pulled over, D/C Howell noticed Defendant reaching for the floor. *See United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) (finding that defendant's "furtive hand movements" formed partial basis for reasonable suspicion); *see also United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) (noting that "slouching, crouching, or any other arguably evasive movement, when combined with other factors particular to the defendant or his vehicle, can add up to reasonable suspicion.") (quoting *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir. 2000)). Second, Defendant continued to breathe extremely heavily during the stop and appeared nervous. *Wardlow*, 528 U.S. at 120 ("Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion."); *Givan*, 320 F.3d at 459 (finding that driver's nervousness during traffic stop contributed to reasonable suspicion "sufficient to extend the stop . . ."); *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001) (holding that defendant's prolonged nervousness during traffic stop was one factor in determining reasonable suspicion to further detain defendant).

After reviewing Defendant's documents and asking him about his relationship to Elton Turnbull,[5] D/C Howell asked Defendant whether he had any weapons or illegal items in the car.[6]

---

[5] "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson,* 129 S.Ct. 781, 788 (U.S. 2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100-101 (2005)). The questions about Elton Turnbull did not measurably extend the duration of the stop.

[6] The Court notes that other Circuits have expressly approved asking a motorist whether he or she has a weapon as part of a routine traffic stop. *See, e.g., United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007) ("For several years the rule in this circuit has been police officers are free to question individuals regarding the presence of weapons. The justification for this rule is rooted in officer safety.") (citing *United States v. Holt*, 264 F.3d 1215 (10th Cir.2001) (en banc)); *United States v. May*, 1999 WL 1215651, at *3 (D.C. Cir. Nov. 8, 1999) (unpublished) ("Certainly ... the Fourth Amendment ... permits an officer to ask simply whether a driver has a gun."), *cert. denied*, 529 U.S. 1011 (2000). This Court has previously held that Government may use a suspect's statement in response to a question about whether he or she is armed at trial under *Miranda*'s "public safety exception" when "considering all the circumstances, it was objectively

6

Defendant initially refused to respond to this question and when asked again, Defendant provided an evasive response – that he was out getting diapers for his child. Defendant was not required to answer this question. His evasive answer, however, did not assuage Howell's safety concerns and Howell was justified in taking further safety measures such as calling for backup. *See Holt*, 264 F.3d at 1224 ("Although nothing compels the motorist to answer such a question, when a motorist declines to answer it, the officer may draw clues from that declination that he or she should be more prudent and concerned about personal safety. The officer may not use the refusal to answer as the basis for a more intrusive search, but the officer would certainly be permitted to use that information to justify prudent safety-related measures.").

When D/C Howell left Defendant's Explorer to briefly talk to Chief Benta, Defendant again reached down towards the floor of his vehicle, precipitating Howell's return to the vehicle to instruct him to keep his hands on the wheel. D/C Howell testified that, at this point, he called a K-9 backup unit because he was concerned for his safety and believed that Defendant may have possessed contraband in the car. Defendant's continued suspicious behavior – including his repeated hand movements toward the floor of the Explorer, prolonged nervousness and evasive answer to D/C Howell's question about weapons in the car – provided reasonable suspicion that Defendant possessed something illegal in the car, sufficient to justify his continued detention

---

reasonable for [police] to have thought that asking [defendant] whether the object indeed was a gun was necessary to protect himself, his partner, or the public from immediate danger." *United States v. Murray*, 2010 WL 3069485, at *9 (D.V.I. 2010) (citing *United States v. Duncan*, 308 Fed.Appx. 601, 605-606 (3d Cir. 2009)). Here, Defendant's response to that question is not the subject of Defendant's motion to suppress. The response did, however, inform D/C Howell's reasonable suspicion. The Court finds that, under the totality of the circumstances present here – the late time of night, the fact that D/C Howell was alone with Defendant, Defendant's nervous appearance, and his initial downward reaching movement – it was objectively reasonable for D/C Howell to ask Defendant whether there was a gun in the car. The Court does not comment on whether it is appropriate for the VIPD to ask every stopped motorist whether he or she has guns, drugs, or other contraband in the car as a matter of routine.

while police furthered their investigation.[7]  *See United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010) ("To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.") (citations omitted); *see also United States v. Sharpe*, 470 U.S. 675, 687 (1985) (holding that "in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.").

The K-9 unit arrived a few minutes later.  Despite multiple commands from officers of the VIPD to keep his hands on the wheel, Defendant continued to reach toward the floor of his car.  At one point, Defendant put the Explorer in gear and released the emergency brake as if to flee from the scene.  He was then arrested by Officer Ramos for interfering with an officer in the discharge of his duties.  Defendant's conduct was sufficient to justify his arrest for interfering with an officer in the discharge of his official duties as he continually disobeyed a lawful command to keep his hands on the wheel.  *See Moorefield*, 111 F.3d at 12 (holding that police may lawfully order occupants of car to keep their hands in the air);[8]  14 V.I.C. § 1508 (2011) ("Whoever willfully resists, delays or obstructs any public officer in the discharge, or attempt to discharge any duty of his office, shall, when no other punishment is prescribed by this title, be fined not more than $500 or imprisoned not more than 1 year, or both."); 14 V.I.C. § 883 (2011) ("Whoever disobeys the lawful orders of any police officer . . .  shall be fined not more than

---

[7] At the hearing, Defendant argued that his detention exceeded the purpose of the traffic stop, in violation of *Florida v. Royer,* 460 U.S. 491, 500 (U.S. 1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). However, as explained above, Defendant's actions gave the investigating officers reasonable suspicion that illegal activity – other than the traffic violation – was afoot.

[8] The Court sees no operative difference between instructing a motorist to keep his hands in the air versus keeping them on the steering wheel.

$200 or imprisoned not more than 1 year, or both."). Accordingly, Defendant's detention was not unreasonably prolonged.

### b. Search of the Explorer

Defendant's second contention is that the firearm in question was discovered during an unlawful search-incident-to-arrest, because at the time of the search, Defendant had been secured by several police officers and there was no reasonable possibility that he could have accessed the interior of the car. In support of this claim, Defendant cites the case of *Arizona v. Gant*, 129 S.Ct. 1710 (U.S. 2009), where the Supreme Court narrowed the scope of the search-incident-to-arrest-doctrine and held that "searches of a suspect's automobile are not permitted incident to an arrest when the police 'could not reasonably have believed ... that [the arrestee] could have accessed his car at the time of the search.'" *United States v. Shakir*, 616 F.3d 315, 318 (3d Cir. 2010) (quoting *Gant*, 129 S.Ct. at 1719).

The Court does not need to analyze the discovery of the firearm under the search-incident-to-arrest-doctrine, because, as argued by the Government and expressly stated in *Gant*, police may search a vehicle "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Gant*, 129 S.Ct. at 1714. Defendant was arrested by Officer Ramos for repeatedly violating his instruction to keep his hands on the wheel by *reaching down toward the floor*. D/C Howell first peered into the vehicle and noticed a bulge under the carpet where Defendant had repeatedly reached. This bulge, combined with his prior observations of Defendant's nervousness, evasive answers, flight attempt, and repeated reaches toward the floor despite multiple commands to keep his hands on the wheel, provided D/C Howell with probable cause to believe that there was something of evidentiary value under the

carpet relating to Defendant's arrest for interfering with an officer.[9]  A lifting of the carpet revealed the firearm.  Accordingly, the discovery of the firearm did not violate Defendant's Fourth Amendment rights.

### III.     Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress. Accordingly, it is hereby **ORDERED** that

Defendant's Motion to Suppress is **DENIED**.

**ENTERED**:

Dated: February 9, 2011

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE

---

[9] In addition, the actions of Defendant were sufficient to provide D/C Howell with probable cause to believe that the "bulge" contained some form of contraband.  *See Gant*, 129 S.Ct. at 1721 (noting that *United States v. Ross*, 456 U.S. 798 (1982) "allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader.").